## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 08-22708 |
| MARTIN COLLIER and | ) | |
| VALERIE COLLIER | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| SOUTHERN CALIFORNIA GAS | ) | |
| COMPANY, | ) | |
| | ) | Adv. No._____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARTIN COLLIER, | ) | Chief Judge Carol A. Doyle |
| | ) | |
| Defendant. | ) | |

**COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT**

Plaintiff Southern California Gas Company ("SoCalGas"), by and through its undersigned attorney, alleges as to itself and its own acts, and states upon information and belief as to all other matters, as follows:

**NATURE OF CASE**

1.  By this action, SoCalGas respectfully requests that this Court enter a judgment determining that its claim against debtor Martin Collier ("Collier") is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4) and 523(a)(6).

**JURISDICTION AND VENUE**

2.  This is an adversary proceeding filed in connection with this Chapter 7 bankruptcy case filed by the Debtor on or about August 29, 2008.

3.  This court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

4.  Venue is proper pursuant to 28 U.S.C. § 1409.

5.  This proceeding is a core proceeding.

417724.1

–1–

## PARTIES

6. SoCalGas is a corporation organized and existing under and by virtue of the laws of the State of California with its principal place of business located in Los Angeles, California.

7. SoCalGas is informed and believes and based upon such information and belief alleges that Defendant Collier is an individual residing and doing business in Chicago, Illinois.

## OTHER RELEVANT ENTITIES

8. SoCalGas is informed and believes and based upon such information and belief alleges that Gersten Construction Co. ("Gersten") is and at all times mentioned herein was a California corporation organized and existing under and by virtue of the laws of the State of California with its principal place of business located in Encino, California.

9. SoCalGas is informed and believes and based upon such information and belief alleges that GC Management Company, LLC ("GC Management") at all times mentioned herein was a California limited liability company with its principal place of business located in Encino, California. GC Management is an affiliate of Gersten.

10. Hawaiian Gardens Apartments is a California limited partnership with its principal place of business in Los Angeles County, California. As alleged further below, SoCalGas is the sole limited partner and Gersten is the sole general partner of the Hawaiian Gardens Apartments limited partnership.

11. SoCalGas is informed and believes that in or about April 19, 1999 through November, 2006, Gersten, Collier and GC Management entered into a conspiracy to harm SoCalGas by diverting funds from the sale of the Hawaiian Gardens Apartments complex to others and that Gersten, Collier and GC Management did the acts alleged below pursuant to and in furtherance of this conspiracy.

12. SoCalGas is informed and believes and based upon such information and belief alleges that Gersten and GC Management are the alter egos for defendant Collier in that there is

a unity of interest of ownership and/or control between them and that their separate identities no longer exist and there would be an inequitable result of the actions of Gersten and GC Management are treated as those of Gersten and GC Management alone.

13.    SoCalGas brings each of the causes of action in this complaint in its own right and, alternatively, should it be determined that any of them must be brought derivatively on behalf of the Hawaiian Gardens Apartments limited partnership, SoCalGas brings these claims on behalf of the Hawaiian Gardens Apartments limited partnership.

14.    SoCalGas has made and hereby makes demand on the Hawaiian Gardens Apartments limited partnership and its general partner to pursue the claims set forth in this complaint and the Hawaiian Gardens Apartments limited partnership has refused to pursue them.  Any further demand would be futile because the claims are against the general partner itself, its affiliates and its officers and shareholders.

## FACTUAL BACKGROUND

15.    On or about August 25, 1970, SoCalGas, as the limited partner, and Gersten and Albert Gersten, as the general partners, entered into a written Agreement of Limited Partnership ("Agreement").  After the death of Albert Gersten in 1980, Gersten became the sole general partner.  This relationship imposed fiduciary duties from Gersten as the general partner to SoCalGas as the limited partner not to obtain any advantage from self-dealing or control of the assets of the partnership or by misrepresentation, concealment, or adverse pressure for the benefit of the general partner to the detriment of the limited partner.

16.    The purpose of the parties' limited partnership was to acquire land, construct, own and operate a 264-unit, FHA-regulated, low-income housing project under the made of the "Hawaiian Gardens Apartments."  Pursuant to paragraph 5(b) of the Agreement, the partnership was to be dissolved upon the sale of this project.  Pursuant to paragraph 14(a) of the Agreement, any such sale required the written consent of all partners.

17.   Pursuant to paragraph 15(a) of the Agreement, the net cash proceeds from the sale of the Hawaiian Gardens Apartments project were to be distributed 90% to SoCalGas and 10% to Gersten.

18.   Pursuant to the terms of the Agreement, a 264-unit apartment complex was built at 11950 Centralia Road, Hawaiian Gardens, California 90716.

### A.   Discussions Regarding Sale of the Property

19.   On April 23, 1999, Collier, as president of GC Management, wrote a letter to Rand Wassem ("Wassem"), Manager of Corporate Real Estate for Sempra Energy (the parent company of SoCalGas) advising him that several buyers had inquired about the availability of the Hawaiian Gardens Apartment complex. Collier inquired whether SoCalGas was interested in selling. This led to considering a possible sale of the apartment complex and a subsequent proposal for a sale of the apartment complex.

20.   On or about November 12, 2003, Lawrence J. Lagerbauer, acting on behalf of Gersten and GC Management, wrote a letter informing SoCalGas that the Hawaiian Gardens Apartment limited partnership had signed a "purchase & sale" agreement to sell the apartment complex to Amerland Communities, LLC, (a California LLC) "for $22,150,000."

21.   SoCalGas did not receive further details concerning the sale until, after repeated requests by Wassem, Gersten faxed Wassem the "Purchase Agreement and Escrow Instructions" on July 1, 2004, less than two weeks prior to the July 13, 2004 scheduled closing date. Section 2.1.1 of the Purchase Agreement and Escrow Instructions stated:

> Payment to Property Manager. Buyer acknowledges that Seller intends to pay Two Million Dollars ($2,000,000) out of the Purchase Price to GC Management Company, LLC, a California limited liability company, the property manager for the Property.

22.   At or about this time, SoCalGas also received from Collier an Estimate of Closing that showed "$2,000,000" for "Management Contract" to GC Management. There was no legitimate basis for a $2 million payment to GC Management. SoCalGas never consented to any payment

–4–

to Gersten or GC Management for terminating any management contract or otherwise. Indeed, SoCalGas was not provided with any purported management contract entered into by GC Management prior to this date. Conveniently, GC Management is 50% owned by Martin Collier.

23. Wassem immediately objected to this $2 million payment to GC Management. Telephone calls ensued between Wassem, Kari McCulloch, counsel for SoCalGas, Collier, and Alan Bergman, counsel for Gersten and GC Management. This led to an agreement (the "Settlement Agreement") whereby SoCalGas consented to the partnership's payment of a "sales commission" in the amount of $618,000 to GC Management (3% of the sales price) provided distribution of the sales proceeds would be as stated in the revised Estimate of Closing. The revised Estimate of Closing reflected $618,000 to be paid for the "Management Contract" in lieu of the $2 million payment. In return, Gersten agreed to pay only $618,000 from the sales proceeds to GC Management, and to distribute to SoCalGas its 90% share of the net proceeds.

### B. Sale of the Property

24. Consistent with the parties' Settlement Agreement, on July 9, 2004, Collier faxed to Ms. McCulloch, counsel for SoCalGas, an updated version of the Estimate of Closing costs, which he referred to as "recast closing est." in his fax cover sheet. This revised Estimate of Closing reflected $618,000 for "Management Contract", whereas the original Estimate of Closing had previously read $2,000,000.

25. On July 12, 2004, pursuant to the Settlement Agreement, SoCalGas faxed a letter to GC Management, confirming the agreement and consenting to the sale of the apartment complex to Amerland Communities, in reliance on the agreement and on the commitment that the revised Estimate of Closing reflected an accurate estimate of distributions that would be made to the partners.

26. The next day, Mr. Bergman, counsel for GC Management and/or Gersten Construction, sent a letter to the escrow company forwarding the July 12, 2004 letter "authorizing the payment of a commission in the amount of $618,000 to GC Management,

LLC." Mr. Bergman's letter directed the escrow that this amount should be included as a closing disbursement on the escrow's closing statement. The escrow closed on or about July 30, 2004, and the $618,000 was paid from escrow to GC Management. The net proceeds of the sale were sent to Gersten for distribution.

### C. Collier Improperly Sends Funds To A Company Half Owned By Him Instead Of Delivering Them to SoCalGas.

27. After the closing of the escrow and distribution of the funds to Gersten pursuant to the Settlement Agreement, SoCalGas inquired about the timing of the final distribution because the project had been sold and the Hawaiian Gardens Apartments limited partnership was being dissolved. On November 18, 2004, SoCalGas received a letter from Collier stating that GC Management had received $2 million wholly contrary to the Settlement Agreement. Specifically, Collier stated:

> The Management Contract between Hawaiian Gardens and GC Management provides for termination "by the mutual consent of the parties." Over a year ago, in connection with the sale of the Property, it was agreed that 2 million dollars would be paid for the termination of the Management Contract. This obligation is satisfied by the payment of the commission amount and as shown in the Schedule the amount of $1,382,000.00.

28. SoCalGas objected to this assertion that $2 million (i.e., $1,382,000 in addition to the agreed upon $618,000) was due to GC Management for termination of the management contract or otherwise and reiterated that it had never agreed to pay any amount for termination of a management contract in connection with this sale beyond the agreed upon $618,000.

29. Notwithstanding SoCalGas's objection, on or about May 27, 2005, Collier advised SoCalGas that the "funds associated with the cancellation of the management contract with GC Management [i.e. $2 million] … were disbursed at the closing and are not currently available."

30. SoCalGas is informed and believes, and thereon alleges, that the $2,000,000 has been inappropriately distributed by Gersten to GC Management and Collier. These funds should

rightfully have been paid to SoCalGas, and SoCalGas has been damaged in the sum of $1,800,000 (its 90% share) plus interest at the legal rate from the date such payment was due.

31. Gersten, GC Management and defendant Collier represented that they would perform the Settlement Agreement memorialized in the letter dated July 12, 2004. SoCalGas is informed and believes, and thereupon alleges, that, in fact Collier, personally and on behalf of Gersten and GC Management, intended at the time the agreement was made that the full $2 million, rather than $618,000, would be paid to GC Management, and knew that the representation that the agreement would be performed was false. The representation was intended to, and did, cause SoCalGas to reasonably rely upon it, consent to the sale of the apartment complex, and allow the escrow to go forward. SoCalGas was thereby damaged by the loss of $1,800,000, its 90% share of the $2,000,000 that was wrongfully distributed to GC Management and others, with interest thereon from the date said funds were due.

## FIRST CAUSE OF ACTION

### (Fraud - 11 U.S.C. § 532(a)(2))

32. SoCalGas realleges and incorporates by reference herein the allegations in paragraphs 5-31 above.

33. As fully set forth above, Collier represented to SoCalGas that he, Gersten and GC Management would perform the Settlement Agreement memorialized in the letter dated July 12, 2004.

34. SoCalGas is informed and believes, and thereupon alleges, that, in fact Collier, personally and on behalf of Gersten and GC Management, intended at the time the agreement was made that the full $2 million, rather than $618,000, would be paid to GC Management, and knew that the representation that the Settlement Agreement would be performed was false.

35. The representation was intended to, and did, cause SoCalGas to reasonably rely upon it, consent to the sale of the apartment complex, and allow the escrow to go forward.

36.     SoCalGas was thereby damaged by the loss of $1,800,000, its 90% share of the $2,000,000 that was wrongfully distributed to GC Management and others, with interest thereon from the date said funds were due.  Collier thus obtained money and property by false pretenses, a false representation, or actual fraud, and has violated 11 U.S.C. § 532(a)(2).

## SECOND CAUSE OF ACTION

**(Fraud While Acting in a Fiduciary Capacity, Embezzlement and Larceny - 11 U.S.C. § 532(a)(4))**

37.     SoCalGas realleges and incorporates by reference herein the allegations in paragraphs 5-36 above.

38.     As an officer of Gersten, Collier owed SoCalGas a fiduciary duty under the Agreement of Limited Partnership, and his direct agreement with SoCalGas to abide by the terms of the Settlement Agreement.

39.     Gersten has breached its fiduciary duties arising under the Agreement of Limited Partnership, its role as the general partner, and its agreements with SoCalGas not to benefit by self-dealing, fraud, misrepresentation, concealment and diversion of assets.  Defendant Collier and GC Management have participated in and aided and abetted such breaches.

40.     SoCalGas is informed and believes and based upon such information and belief alleges that Gersten and GC Management are the alter egos for defendant Collier in that there is a unity of interest of ownership and/or control between them and that their separate identities no longer exist and there would be an inequitable result of the actions of Gersten and GC Management are treated as those of Gersten and GC Management alone.  Acting through Gersten and GC Management, defendant Collier has thus breached his fiduciary duties arising under the Agreement of Limited Partnership, his role as the general partner, and his agreements with SoCalGas not to benefit by self-dealing, fraud, misrepresentation, concealment and diversion of assets.

41.     Defendant Collier, Gersten and GC Management came into control and possession of the $1,800,000 belonging to SoCalGas as alleged above.  In spite of SoCalGas's demand for

release of such property to it, defendant Collier, Gersten and GC Management refused to release it and wrongfully diverted it to themselves. As such, Collier has committed fraud, while acting in a fiduciary capacity, embezzlement or larceny and has violated 11 U.S.C. § 532(a)(4).

### THIRD CAUSE OF ACTION

**(Willful and Malicious Injury by the Debtor to another Entity - 11 U.S.C. § 532(a)(6))**

42. SoCalGas realleges and incorporates by reference herein the allegations in paragraphs 5-41 above.

43. Acting through Gersten and GC Management, and through his own direct misrepresentations, defendant Collier willfully and maliciously injured SoCalGas, causing it to incur the loss of $1,800,000, its 90% share of the $2,000,000 that was wrongfully distributed to GC Management and others and has violated 11 U.S.C. § 532(a)(6).

### RELIEF REQUESTED

WHEREFORE, SoCalGas respectfully requests this Court (1) enter a judgment determining the debts the Debtor owes to SoCalGas are determined to be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4) and 523(a)(6); and grant it such other and further relief as this Court may deem just and proper.

Dated: December 12, 2008

Sabina B. Clorfeine
Senior Counsel
SEMPRA ENERGY
101 Ash Street
San Diego, CA 92101-3017
(619) 699-5126

Mark E. Leipold (#6194124)
GOULD & RATNER LLP
222 N. LaSalle St., Suite 800
Chicago, IL 60601
(312) 236.3003

SOUTHERN CALIFORNIA GAS CO.

By:    /s/Mark E. Leipold